**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAVID MUNCHINSKI**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13cv1280 |
| | ) | **Electronic Filing** |
| **GERALD SOLOMON**, and | ) | |
| **RALPH WARMAN**, | ) | |
| in their individual capacities; and **DANA** | ) | |
| **L. FAYOCK**, Executrix of the Estate of | ) | |
| George Fayock, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

June 27, 2017

## I.    INTRODUCTION

Plaintiff, David Munchinski ("Munchinski" or "Plaintiff"), filed a two count Amended

Complaint against Defendants, Gerald Solomon ("Solomon"), Ralph Warman ("Warman"), John

Kopas, III ("Kopas")[1], and Dana L. Fayock, Executrix of the Estate of George Fayock

"Fayock")(collectively "Defendants"), asserting claims under 42 U.S.C. § 1983 alleging

violation of his rights under the Sixth and Fourteenth Amendments to the United States

Constitution at Count I and a claim under 42 U.S.C. § 1983 alleging malicious prosecution at

Count II. Solomon, Warman and Kopas were prosecutors for the Fayette County District

Attorney's Office during the times relevant to this action, and George Fayock ("Fayock) was an

employee of the Pennsylvania State Police.  Motions for Summary Judgment have been filed on

behalf of all the Defendants and on behalf of Munchinski.  Responses to the motions have been

filed and the motions are now before the Court.

---

[1]    A motion to dismiss filed on behalf of Kopas was granted and the claims against Kopas
were dismissed by Order of Court dated September 15, 2014.

## II.    STATEMENT OF THE CASE

On or about December 2, 1977, two (2) men, James P. Alford ("Alford') and Raymond Gierke ("Gierke") were sexually assaulted and murdered in Bear Rocks, Fayette County, Pennsylvania. Solomon & Warman Concise Statement of Material Facts ("S & W CSMF") ¶ 1. Trooper Montgomery Goodwin ("Goodwin") of the Pennsylvania State Police was the lead investigator on the Alford/Gierke homicide case. Fayock Concise Statement of Material Fact ("F CSMF") ¶ 2.  Over the next several years, the State Police interviewed more than one hundred individuals and pursued numerous leads without success. F CSMF ¶ 4.

Munchinski's name surfaced as a suspect in the murders in January 1978, when several witnesses reported that Munchinski confessed to the murders at the Five Points Bar in Greensburg, Pennsylvania. F CSMF ¶ 5.  Goodwin interviewed Munchinski and Leon Scaglione ("Scaglione") on February 8, 1978 in the Westmoreland County Prison. F CSMF ¶ 7. Munchinski denied involvement and offered assistance if Goodwin would help him with certain charges filed against him.  F CSMF ¶ 8.

On June 24, 1979, Goodwin and Corporal Mangiacarne ("Mangiacarne") interviewed Richard Bowen ("Bowen"), who was incarcerated in Greensburg. F CSMF ¶ 9.  Bowen told the State Police that Scaglione had admitted shooting Alford and Gierke in Bear Rocks. F CSMF ¶ 10.  On September 9, 1982, Goodwin, accompanied by Corporal Bernard Gorman ("Gorman") of the Pennsylvania State Police, interviewed Bowen at the Monaca Police Department. F CSMF ¶ 11; S & W CSMF ¶ 14.  Goodwin had Bowen sign a waiver of rights prior to the interview. Joint Appendix Solomon/Warman ("JA") Ex. 4; Munchinski Appendix [ECF No. 150], ("Munch. App.") Exhibit C, p. 119. During the interview, Bowen told Goodwin that he drove Munchinski and Scaglione to the cabin in Bear Rocks, and waited in the car while Munchinski and Scaglione went inside. F CSMF  ¶¶ 12 & 13; JA Ex.4.  Bowen told Goodwin that he heard gun shots,

Munchinski and Scaglione ran from the cabin, and they drove back to Greensburg. F CSMF ¶ 13; JA Ex. 4. Bowen also stated that he read about the killings the next day, and he went to Oklahoma to stay with his father.[2] *Id.* Bowen told Goodwin he would testify if he was given immunity. JA Ex. 4.

Bowen agreed to go with Goodwin and Gorman to the Fayette County Courthouse and furnish a statement to District Attorney Solomon. F CSMF ¶ 15; JA Ex. 4. Solomon testified that the purpose of the meeting was to interview Bowen to determine "if, in fact, [Bowen] had information relative to [the Alford/Gierke] homicides." Munchinski Appendix [ECF. 139] ("M. App.") Ex. 12 p. 120. Bowen signed a waiver of rights and was interviewed by Solomon and Assistant District Attorney Warman. F CSMF ¶ 16; JA Ex. 4. Gorman, Fayock, and Goodwin, all from the Pennsylvania State Police, were also present during the interview. *Id.* Bowen provided a statement, which Goodwin indicated was recorded and was to be transcribed by the DA's office. JA Ex. 4.

On October 21, 1982, Goodwin, Gorman and Mangiacarne appeared with Bowen in Solomon's office, and Bowen gave another statement which, unlike the previous statement he gave in September, indicated that he was in the cabin and witnessed the sexual assaults and the shootings of Alford and Gierke. JA Ex.6. The statement was taped and transcribed. F CSMF ¶ 21. Based upon Bowen's statement, Goodwin prepared an Affidavit of Probable Cause, and signed and filed the criminal complaint against Munchinski.

On October 22, 1982, Munchinski and Scaglione were arrested and charged with two (2) counts of Criminal Homicide and two (2) counts of Criminal Conspiracy to commit homicide.

_____

[2]     Bowen remained in Oklahoma until March of 1978 when he was extradited on burglary charges filed against him in Westmoreland County.  F CSMF ¶ 14.

*Munchinski v. Wilson*, 807 F. Supp. 242, 250 (W.D. Pa. 2011). Munchinski and Scaglione were jointly tried in April of 1983. *Id.* There was no physical evidence linking either individual to the crimes. Instead, the Commonwealth relied heavily on the testimony of Bowen, who, as stated above, claimed to have been an eyewitness to the murders, and whose testimony alone placed Munchinski at the scene of the crimes. *Id.* Specifically, Bowen testified that Gierke and Alford were raped by Scaglione and Munchinski, respectively, and that the two victims were murdered almost immediately thereafter. *Munchinski v. Wilson*, 694 F.3d 308, 315 (3d Cir. 2012). Bowen's trial testimony, however, was markedly different from the statements he gave police when he first approached them as a potential witness. *Id.* Bowen's testimony was also at odds with certain facts that were elicited at trial. For example, Bowen claimed that he drove Scaglione and Munchinski to the site of the murders in Scaglione's lime green Ford Gran Torino. *Id.* Scaglione, however, did not purchase that Gran Torino until almost six months after the murders. *Id.*

The prosecution also presented Lori Lexa ("Lexa") and Deborah Sue Dahlmann ("Dahlmann") who testified that Munchinski and Scaglione confessed to murdering Alford and Gierke while at the Five Points Bar in Greensburg on January 28, 1978. *Munchinski v. Wilson*, 807 F. Supp. 2d at 250; S & W CSMF ¶ 4. Lexa and Dahlmann were friends prior to their involvement in the case, and Dahlmann's ex-husband, Ed Wiltrout, was a prime suspect in the murders of Alford and Gierke. *Munchinski v. Wilson*, 694 F.3d at 315. At that time, however, Munchinski was unaware that a witness told police that Wiltrout was one of the shooters. *Id.* Munchinski was unable to cross-examine Dahlmann with the witness statement implicating Wiltrout because the report documenting that statement had not been produced. *Id.* The joint trial ended in a hung jury, and a mistrial was declared. *Id.*

On October 31, 1983, upon the filing of a "Petition to View Evidence" on behalf of

Munchinski and Scaglione, the Honorable Richard D. Cicchetti "ordered and directed" that:

> counsel for the defendants, and the defendant, David Joseph Munchinski be
> permitted to examine, inspect, photograph and make record notes of all evidence
> that the Office of the District Attorney and/or the Pennsylvania State Police or
> their agents, may have in their possession or that they may acquire, that relates to
> the above captioned cases.

M App. Ex. 5. Despite Judge Cicchetti's order, Munchinski contends that following exculpatory

evidence was withheld:

(1) Police reports showing that Bowen, the purported eyewitness and get-away
driver, was in Oklahoma on the night of the murders;

(2) A police report showing that an individual named Mike Urdzick had
confessed with specificity to murdering the victims with an accomplice,
Edgar Wiltrout;

(3) A police report by Pennsylvania State Trooper Montgomery Goodwin which
contradicted Bowen regarding the timing of the anal rape of the victims;

(4) A report memorializing a conversation with a deputy coroner that
contradicted Bowen's account of the anal rape of the victims;

(5) A one (1) page addendum to the autopsy report that was exculpatory on its
face;

(6) A police report showing the existence of nail scrapings which could have
been tested;

(7) Information on the leniency Defendants allegedly offered Bowen in
exchange for his testimony;

(8) A police report regarding a conversation between one of the victims and a
telephone operator, which contradicted Bowen's eyewitness account;

(9) A police report indicating the involvement of an individual named Robert
Mangello in the murders;

(10) A police report of indicating the involvement of an individual named Joseph
Lucy in the murders;

(11) A police report by Trooper Goodwin regarding Bowen's first statement
provided to law enforcement; and

(12) The content of Bowen's tape recorded statement made on September 9, 1982. Am. Compl. ¶¶ 33, 34.

In October 1986, the Commonwealth retried Scaglione. During his trial, Scaglione admitted to committing the murders. Scaglione testified that Munchinski had no involvement in the murders, but that Scaglione had committed the crimes with an associate named Homer Stewart who allegedly resembled Munchinski. *Munchinski v. Wilson*, 694 F.3d at 315. Scaglione was convicted of two counts of first degree homicide and two counts of second degree homicide. *Id.*

The Commonwealth retried Munchinski in November of 1986. *Id.* With no physical evidence, the Commonwealth again presented the testimony of Bowen, Lexa, and Dahlmann, and also offered the testimony of Bernard Furr, another acquaintance of Dahlmann's, who testified regarding an alleged confession to the murders by Munchinski in January 1978, and the testimony of Harold Thomas, who testified that Munchinski confessed while in jail in 1983. *Munchinski v. Wilson*, 694 F.3d at 316. In his case, Munchinski sought to introduce Scaglione's testimony from his retrial, in which he implicated Stewart in the murders and exonerated Munchinski. Scaglione, however, refused to testify, invoking his Fifth Amendment right against self-incrimination. *Id.* The trial court denied Munchinski's request that Scaglione be granted use immunity, and also ruled that Scaglione's prior testimony was inadmissible under Pennsylvania law. *Id.* Munchinski, therefore, was unable to introduce any exculpatory testimony from Scaglione. *Id.*

In his closing argument to the jury, Warman stated: "did you hear anyone testify that Bowen received anything other than immunity? No . . . does that bolster his testimony to indicate that Bowen was there?" *Munchinski v. Wilson*, 694 F.3d at 316. The Third Circuit found that

Warman's argument "misled the jury" because prosecutors in Fayette County had reached a leniency agreement with Bowen, whereby Westmoreland County prosecutors would be lenient towards Bowen in his ongoing parole revocation hearings in exchange for Bowen's testimony against Munchinski. *Id.* In addition, the prosecutors failed to turn over the documents evidencing this leniency agreement to Munchinski. *Id.* Munchinski was found guilty of first-degree homicide and, on June 15, 1987, he was sentenced to two consecutive life sentences. *Id.* The Superior Court of Pennsylvania affirmed the judgment of sentence on November 13, 1991. *Id.*

Solomon was elected to the Court of Common Pleas of Fayette County, Pennsylvania in November of 1987, and did not represent the Commonwealth thereafter. S & W CSMF ¶ 99.

In November 1991, Bowen, who was imprisoned in Oklahoma at the time, asked to speak with the Federal Bureau of Investigation (the "FBI") with regard to the murders of Alford and Gierke. *Munchinski v. Wilson*, 694 F.3d at 316. Bowen was interviewed in prison by FBI Special Agent Matthew Schenk. *Id.*; M. App. Ex. 11. During the interview, Bowen recanted his trial testimony, stating, *inter alia*, that: (1) he was not involved in any fashion with Scaglione or Munchinski in the killings of Alford and Gierke; (2) he was told what his testimony would be by Troopers Goodwin and Gorman, and District Attorney Solomon; (3) he was provided a fictitious script as to what he was to testify to during the trial for the killings of Alford and Gierke; (3) he was given money, assistance with certain legal problems, and was promised a $10,000 reward posted by the victims' parents in exchange for his cooperation and testimony; and (4) Goodwin told Bowen that if he did not testify against Scaglione and Munchinski, Goodwin would get someone to testify against him for the murders. M. App. Ex. 11.

When Munchinski became aware of Bowen's recantation to Special Agent Schneck, he arranged to depose Bowen. *Munchinski v. Wilson*, 694 F.3d at 316; M. App. Ex. 20. On April 4, 1992, Bowen testified that he did not meet Munchinski until 1978 when they were serving time

in jail in Westmoreland County. M. App. Ex. 20, p. 7. Bowen further testified that on the day

Alford and Gierke were killed, he was at his father's house in Okmulgee, Oklahoma. M. App.

Ex. 20, p. 9. Bowen further stated that Scaglione did in fact admit to the murders of Alford and

Gierke, but that Scaglione never mentioned Munchinski. M. App. Ex. 20, p. 21. Bowen testified

that Goodwin said he would be charged with murder if he did not testify based upon a narrative

given to him by Goodwin. M. App. Ex. 20, p. 23-24. According to Bowen, Solomon also knew

he did not witness the murders, but insisted he testify that he did in fact witness the murders. M.

App. Ex. 20, p. 42-44.

Munchinski filed his first petition for relief under the Pennsylvania Post-Conviction

Relief Act ("PCRA"), 42 PA. CONS. STAT. ANN. § 9541, et seq. ("PCRA I") on April 16, 1992.

The PCRA I petition sought relief based on two articles of newly-discovered evidence: (1) a

September 1982 report from Trooper Goodwin (the "Goodwin Report")[3] that was intentionally

edited to conceal a reference to a recorded statement made by Bowen; and (2) Bowen's sworn

deposition testimony. *Munchinski v. Wilson*, 694 F.3d at 317. Munchinski's PCRA I was

assigned to Judge William J. Franks of the Court of Common Pleas of Fayette County[4]. *Id.*

Judge Franks held an evidentiary hearing during which Warman admitted that he

intentionally edited the Goodwin Report, removing a paragraph which indicated that Bowen

made a statement in Solomon's office on that date, which was then recorded for future

---

[3]     The Goodwin Report detailed Goodwin's encounter with Bowen on September 9, 1982, and the circumstances surrounding an alleged statement regarding the murders made by Bowen to Goodwin, Gorman, Fayock, Solomon and Warman in Solomon's office.

[4]     PCRA petitions are generally assigned to the judge who presided over a petitioner's trial, however, the judge who had presided over Munchinski's trial and retrial had retired from the bench.

transcription, and that Bowen had signed a waiver of rights. *Munchinski v. Wilson*, 694 F.3d at 318; *Munchinski v. Wilson*, 807 F. Supp. 2d 242, 253 (W.D. Pa. 2011); M. App. Exs. 13 & 18. Warman intentionally removed the paragraph and pasted together the surrounding paragraphs in such a manner as to conceal the removal. *Munchinski v. Wilson*, 807 F. Supp. 2d at 253. Warman testified that he removed the paragraph because, according to him, no statement was actually recorded or transcribed and the reference would be "misleading." *Munchinski v. Wilson*, 694 F.3d at 318; *Munchinski v. Wilson*, 807 F. Supp. 2d at 253. Solomon also testified and corroborated Warman's testimony. *Id.*; *Munchinski v. Wilson*, 807 F. Supp. 2d at 253-254.

Though Judge Franks concluded that no recording had been made of Bowen's statement on September 9, 1982, he ordered the Commonwealth to produce all Pennsylvania State Police investigation files related to the murders of Alford and Gierke, as well as three additional files on Bowen, for an *in camera* review based upon Warman's admission that he modified the Goodwin Report. *Id.*; *Munchinski v. Wilson*, 807 F. Supp. 2d at 254. Judge Franks reviewed the files, and ordered that everything he deemed to be discoverable be produced to Munchinski. *Munchinski v. Wilson*, 807 F. Supp. 2d at 254. Judge Franks found that none of the documents that had been produced as part of Bowen's files were discoverable. *Id.*

Based on Bowen's statement to the FBI and subsequent deposition, Munchinski called Bowen to testify at his PCRA I hearing and recant his trial testimony. *Munchinski v. Wilson*, 694 F.3d at 318. Bowen invoked his Fifth Amendment right against self-incrimination, and Judge Franks granted Bowen use immunity for his testimony. *Id.* Bowen, however, disavowed his deposition testimony and reaffirmed his testimony from the 1986 retrial. *Id.* Bowen subsequently committed suicide while incarcerated in Oklahoma. *Munchinski v. Wilson*, 807 F. Supp. 2d at 254, n.8.

Kenneth Knight ("Knight"), an acquaintance of Bowen's from prison, was also called to testify at the PCRA I hearing. *Munchinski v. Wilson*, 694 F.3d at 319. Knight testified that he introduced Bowen to Scaglione and Munchinski in March 1978, long after the December 1977 murders of Alford and Gierke, when they were incarcerated together in Westmoreland County Jail. *Id.* Knight further testified that Bowen admitted that he was in Oklahoma at the time of the murders, and that he lied under oath during the murder trials. *Id.*

On August 5, 1993, Judge Franks dismissed Munchinski's PCRA I petition, and on December 11, 1995, the Pennsylvania Superior Court affirmed Judge Franks' dismissal. *Id.*

Warman became a judge in the Court of Common Pleas of Fayette County, Pennsylvania in 1996, and did not represent the Commonwealth in the Munchinski case thereafter. S & W CSMF ¶ 125.

On March 21, 2001, Munchinski filed his third PCRA petition[5] (the "PCRA III" petition). S & W CSMF ¶ 126; *Munchinski v. Wilson*, 694 F.3d at 320. Because Solomon and Warman were now sitting judges of the Court of Common Pleas of Fayette County, the remaining judges of the Court of Common Pleas of Fayette County recused themselves from the matter. *Munchinski v. Wilson*, 694 F.3d at 320. The Administrative Office of Pennsylvania Courts assigned the PCRA III Petition to Judge Barry Feudale of the Court of Common Pleas of Northumberland County. *Id.*

In his PCRA III petition, Munchinski alleged that eleven (11) pieces of exculpatory evidence were unlawfully suppressed by the prosecution during his homicide trials in 1983 and

---

[5] Between his first and third PCRA petitions, Munchinski filed his first petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 with the United States District Court for the Western District of Pennsylvania, and a second PCRA petition ("PCRA II"). Neither petition is material to the instant action.

1986, and during his first PCRA proceedings. *Munchinski v. Wilson*, 807 F. Supp. 2d 255. The

District Court identified the alleged exculpatory evidence as follows:

(1)    The Bates report: a one-page report of trooper George F. Bates, dated January 6, 1978, relating an interview with Maria Caccia, who indicated that Bowen had left Pennsylvania for Oklahoma on December 1, 1977.

(2)    The Goodwin/Powell report: a report, dated December 20, 1977, written by Goodwin. In this report, Goodwin indicated that Deputy Coroner Jack Powell informed him that it was believed that the anal intercourse to which Alford was subjected would have taken place 24 hours prior to his death.

(3)    The Powell addendum: a typewritten summary of a phone call, attributed to Fayette County Deputy Coroner Jack Powell, dated December 14, 1977, indicating that the anal intercourse to which Alford was subjected possibly occurred "at least 24 hours" before his death.

(4)    The addendum to Alford's autopsy: a one-page addendum to Alford's autopsy report, dated December 17, 1977 and signed by Dr. Sava, indicating that the medical samples taken from Alford's rectum were of blood group "A". [Munchinski] avers, and the Superior Court concluded, that [his] blood group is "B". Dr. Sava noted in this report that contamination of the samples by the contents of Alford's own urethra "[could not] be entirely ruled out."

(5)    The Mangiacarne/Carbone report: a report written by Corporal Mangiacarne, dated December 16, 1980, relating his interview of an individual named Elizabeth Carbone ("Carbone"). According to this report, Carbone described a detailed confession to the murders [of Alford and Gierke], given to her by an individual named Mike Urdzik ("Urdzik"). In this confession, Urdzik implicated one Ed Wiltrout ("Wiltrout") in the [Alford and Gierke] murders.

(6)    The Kinch report: a report written by Trooper Robert Kinch, dated December 19, 1977, which indicated that certain biological evidence, including nail scrapings, had been taken from Alford. The existence of this evidence was unknown to [Munchinski] until the report's discovery, sometime during the pendency of his first habeas appeal.

(7)    Bowen's parole revocation documents: four pages of documents from Westmoreland County, Pennsylvania, related to parole revocation hearings for Bowen in 1983. [Munchinski] argues that multiple passages in these documents support the conclusion that an undisclosed agreement for leniency existed between Bowen, the Westmoreland County District Attorney's office, and the Fayette County District Attorney's office. Examples of these passages include: "[t]he Actor [Bowen] is present [sic] [in] a situation which could solve his charges. . . ", and "[t]his petition was not filed before this date at the request of

[then Westmoreland County, Pennsylvania,] D.A. John J. Driscoll because of [Bowen's] role as a witness in a murder trial Fayette County."

(8)     The Dunkard/Proud report: a report written by Trooper Edward Dunkard ("Dunkard"), dated December 5, 1977, indicating that Delores Proud ("Proud"), then a dispatcher for the Mt. Pleasant, Pennsylvania, Police Department, received a call at 2:32 A.M. on December 2, 1977, from a telephone operator, who stated, "[a] man said he was shot and lives at 837 Alpine Rd., in Bear Rocks." The report also indicates that Proud received a call about eighteen minutes later requesting an ambulance from Bonnie Blackson, the woman who discovered Alford's body on her porch.

(9)     The Veil/Mangello report: a one page report written by Trooper Richard Veil ("Veil"), dated June 23, 1986, in which inmate Robert Lee Mangello ("Mangello") indicated that Joseph Lucy ("Lucy"), [Munchinski's] criminal co-defendant Scaglione, and a third, unnamed man, committed the murders [of Alford and Gierke] at Bear Rocks in "1972-1973". The record indicates that this document came into [Munchinski's] possession on March 10, 2003, during discovery for his third PCRA proceedings.

(10)     The Madden/Lucy report: the October 15, 1986, report of Trooper William F. Madden ("Madden"), in which Lucy denied Mangello's accusations. However, Lucy went on to say that Mangello had indicated that he was a witness to the shootings at Bear Rocks himself. The record indicates that this document came into [Munchinski's] possession on March 10, 2003, during discovery for his third PCRA proceedings.

(11)     The marked Bates report: a second copy of the above-mentioned "Bates report," received during the course of discovery on March 10, 2003. [Munchinski] argues that, due to the markings made on the report, which emphasize, *inter alia*, the passage "and BOWEN left on the 1st of December," this exhibit is materially different from the unmarked version that had been discovered earlier. [Munchinski] avers that this version of the Bates report was marked in this manner when he received it, and argues that this bolsters his contention that prosecutors knew of the exculpatory information (*i.e.*, that Bowen was in transit to Oklahoma) at the time of the murders [of Alford and Gierke] on December 2, 1977.

*Munchinski v. Wilson*, 807 F. Supp. 2d 255-256 (internal citations omitted).

Judge Feudale held several days of hearings on the PCRA III petition. Judge Franks, who had presided over Munchinski's PCRA I petition, testified at the PCRA III hearing and stated that had he been aware of the Bates Report, the Goodwin/Powell Report, and the Mangiacarne/Carbone Report, which were withheld from his *in camera* review by the

prosecution, he may well have granted relief on Munchinski's PCRA I petition. *Munchinski v. Wilson*, 694 F.3d at 321-322.

Judge Feudale also examined evidence indicating that a tape recording had been made of a statement that was taken from Bowen on September 9, 1982, which had never been produced to Munchinski. *Munchinski v. Wilson*, 807 F. Supp. 2d at 257. This evidence included a police report written by Goodwin on September 9 or 10, 1982, as well as the testimony of Warman and Goodwin with regard to the recorded statement referenced therein. Unlike the PCRA I court, Judge Feudale held that Munchinski had demonstrated by a preponderance of the evidence that a tape of this statement existed and was improperly concealed and withheld by the Commonwealth. *Id.*; *see also Munchinski v. Wilson*, 694 F.3d at 322.

On October 1, 2004, Judge Feudale filed a 114-page opinion analyzing the merits of the PCRA III petition and concluding that:

> (1)     Despite the PCRA I Court's conclusion to the contrary, the recorded statement referred to in the omitted paragraph of the Goodwin Report did exist, and was intentionally withheld by prosecutors;
>
> (2)     Even if no recorded statement existed, Warman's intentional editing of the Goodwin Report violated *Brady v. Maryland*, 373 U.S. 83 (1963);
>
> (3)     Prosecutorial misconduct in violation of *Brady* occurred when, despite Judge Franks Order during the PCRA I proceedings, the entire police file was not turned over for *in camera* review;
>
> (4)     Solomon and Warman both committed prosecutorial misconduct and numerous *Brady* violations leading up to and during the Munchinski's first trial and his retrial; and
>
> (5)     Warman intentionally misled the jury during the retrial when he stated that all Bowen received in exchange for his testimony was immunity, because he was aware that Bowen also received leniency as to a number of probation and parole violations in Westmoreland County.

*Munchinski v. Wilson*, 694 F.3d at 323. The PCRA III court found that the evidence withheld by prosecutors was material under *Brady*, granted Munchinski's petition and vacated his 1986

convictions. The court concluded that Warman and Solomon engaged in serious and intentional prosecutorial misconduct. *Id.*

On October 8, 2004, the Commonwealth appealed Judge Feudale's ruling, and on December 14, 2005, the Superior Court of Pennsylvania issued a nonprecedential and unsigned memorandum opinion reversing the PCRA III court. In its review of the Superior Court's reversal, the United States Court of Appeals for the Third Circuit described the opinion as follows:

> Unfortunately, though the Superior Court's opinion is lengthy, its reasoning is opaque. The memorandum is confusing, and at times internally inconsistent. As best we can understand, the Superior Court concluded that certain articles of evidence listed in the PCRA III petition as undisclosed by the prosecution were not raised on a timely basis, and thus could not be raised as independent claims. Nonetheless, because some of Munchinski's claims were timely, the court concluded that it was required to consider all of the evidence raised in the PCRA III petition. In analyzing the merits of Munchinski's *Brady* claims, the court considered each article of evidence in isolation, never considering the aggregate materiality of all of the withheld evidence.

*Munchinski v. Wilson*, 694 F.3d at 324.

On December 15, 2007, Munchinski filed a second petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Pennsylvania. *Munchinski v. Wilson*, 807 F. Supp. 2d at 259. The District Court determined that Munchinski's petition constituted a "second or successive petition" under the meaning of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id.*; *see also* 28 U.S.C. § 2244(b). The AEDPA, however, requires that a "second or successive petition" for writ of habeas corpus must be filed directly with the court of appeals, therefore the district court lacked jurisdiction over the petition. 28 U.S.C. § 2244(b)(3).

Munchinski's petition was transferred to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 1631, and on November 5, 2009, the Court of Appeals

granted authorization for the District Court to proceed with the adjudication of the petition, finding that Munchinski "ha[d] made a *prima facie* showing that his petition contain[ed] newly discovered evidence." *Munchinski v. Wilson*, 807 F. Supp. 2d 259.

Before reaching the merits of Munchinski's claims under *Brady v. Maryland*, the District Court considered whether Munchinski's petition was timely under the AEDPA[6] and whether Munchinski had procedurally defaulted his claims[7]. *Munchinski v. Wilson*, 694 F.3d at 325-326. Upon consideration of merits of Munchinski's *Brady* claims, the District Court found that that "the Superior Court unreasonably applied *Brady* in violation of 28 U.S.C. § 2254(d)(1), because the court analyzed the materiality of the withheld evidence individually, rather than collectively." *See Munchinski v. Wilson*, 694 F.3d at 326. The Court concluded that:

> [T]he prosecution at Munchinski's 1986 murder trial suppressed favorable evidence that was material to the determination of his guilt or innocence. The suppression of this evidence deprived [Munchinski] of a constitutionally-adequate trial, and the resulting verdict is not worthy of confidence. Additionally, [Munchinski] has adduced new, credible evidence of his innocence, and it is clear that, in light of that evidence along with the 30-plus-year record as a whole, no reasonable trier of fact could have convicted [Munchinski] of the crimes with which he was charged, but for the multitude of constitutional violations that occurred in this case.

*Munchinski v. Wilson*, 807 F. Supp. 2d at 290. The District Court then granted Munchinski habeas relief, vacated his convictions, and gave the Commonwealth 120 days to retry him.

---

[6]    The AEDPA requires that claims based on newly-discovered evidence be filed within one year of the discovery of that evidence. *See* 28 U.S.C. § 2244(d)(1)(D). The court found that the majority of the eleven articles of newly-discovered evidence, with the exception of the Veil/Mangello Report, the Madden/Lucy Report, and the Bates Report II, were raised beyond the one year statute of limitations. The District Court, however, equitably tolled the one-year statute of limitations for the majority of these articles of evidence. *Munchinski v. Wilson*, 694 F.3d at 325-326. This Court no such impediment, and will view all evidence of alleged *Brady* violations.

[7]    The District Court found that failing to allow Munchinski's claims to proceed would result in a fundamental miscarriage of justice. *Munchinski v. Wilson*, 694 F.3d at 326.

The Commonwealth appealed the Order of the District Court on September 2, 2011. The United States Court of Appeals for the Third Circuit affirmed District Court's ruling on September 11, 2012, and ordered the Commonwealth to either release Munchinski or retry him within 120 days of the date of the Court's opinion. *Munchinski v. Wilson*, 694 F.3d at 339. The Commonwealth failed to retry Munchinski within the requisite 120 days, and on June 13, 2013, Judge Nancy Vernon of the Court of Common Pleas of Fayette County granted Munchinski's motion to dismiss all charges filed with prejudice. Am. Compl. ¶ 15.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of

the Rule, the nonmoving party must come forward with "specific facts showing that there is a

genuine issue for trial." FED. R. CIV. P 56(e).  Further, the nonmoving party cannot rely on

unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a

summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond

"by pointing to sufficient cognizable evidence to create material issues of fact concerning every

element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay

Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v.

Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

These rules apply with equal force to cross-motions for summary judgment. *See

Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-

motions for summary judgment, as in this case, the Court considers each motion separately. *See

Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 150 (3d Cir. 1993) (noting

that concessions made for purposes of one party's summary judgment motion do not carry over

into the court's separate consideration of opposing party's motion).


IV.    DISCUSSION

    A.    <u>Solomon and Warman</u>

        1.    Full, Faith and Credit to State Court Decisions; Issue/
           <u>Claim Preclusion; and the *Rooker-Feldman* Doctrine</u>

Solomon and Warman (hereinafter the "Prosecutors") argue that the Full Faith and Credit

Act, 28 U.S.C. § 1738, requires that this Court give the rulings and/or judgments of the state

courts in Munchinski's PCRA petitions both issue and claim preclusive effect in the instant §

1983 action. "When a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. § 1738 to give full faith and credit to the state judgment and, in section 1983 cases, apply the same preclusion rules as would the courts of that state." *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993). This rule applies when assessing both the issue preclusive and claim preclusive effect of the prior state court judgment. *See Migra v. Warren City School District Board of Education*, 465 U.S. 75 (1984).

Before the Court gives full faith and credit to the rulings and/or judgments of the state courts in Munchinski's PCRA petitions, this Court must examine the nature of the particular prior criminal proceedings, and whether Munchinski had a full and fair opportunity to litigate the constitutional issues subsequently brought in his civil rights action, as well as the validity of such judgments. For the reasons set forth below the Court finds that no preclusive effect shall be given to rulings by the courts in either PCRA I or PCRA III, and that *Rooker- Feldman* is inapplicable.

The Pennsylvania Superior Court's reversal of Judge Feudale's order granting Munchinski's PCRA III petition and vacating his 1986 convictions has no preclusive effect because it was invalidated by this Court and the Third Circuit Court of Appeals.

In ruling on a state prisoner's petition for writ of habeas corpus, a federal court is limited in its review of state court proceedings. The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). The AEDPA "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations." *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004); *see also Lewis v. Horn*, 581 F.3d 92, 109-118 (3d Cir. 2009).

In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court specifically observed:

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens , J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102-103. Moreover, because the Munchinski's habeas petition was a second or successive petition, he was required to demonstrate "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). Courts have referred to this statute as requiring a "gateway" showing of actual innocence. *Munchinski v. Wilson*, 694 F.3d at 335 (citing *United States v. MacDonald*, 641 F.3d 596, 611-612 (4th Cir. 2011)).

Applying the strict standards of the AEDPA, the Court of Appeals affirmed the district court's granting of the habeas petition, concluding, *inter alia*, that:

Munchinski has shown, by clear and convincing evidence, that no reasonable juror would vote to convict him based on all of the evidence that should have been introduced at trial, absent the Commonwealth's constitutional violations. We also conclude that Munchinski has introduced new and reliable evidence in support of the constitutional claims in his second or successive petition. We acknowledge that both the Supreme Court and Congress have set a high standard for second or successive habeas petitions that "permits review only in the 'extraordinary' case.". . . "Extraordinary" is how Judge Feudale characterized this case when it was before him at the PCRA III stage, and "extraordinary" is how we view it for second or successive habeas purposes.

*Munchinski v. Wilson*, 694 F.3d at 339 (internal citations omitted). Having invalidated

Munchinski's conviction, the judgment of the Pennsylvania Superior Court is not an impediment

to his § 1983 claims.

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court dealt with the issue of

whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner

seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily

would implicate the unconstitutionality of the prisoner's conviction or sentence. *Id.* at 480-490.

There, the Court specifically held:

> [I]n order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness would
> render a conviction or sentence invalid, a § 1983 plaintiff must prove that the
> conviction or sentence has been reversed on direct appeal, expunged by executive
> order, declared invalid by a state tribunal authorized to make such determination,
> or called into question by a federal court's issuance of a writ of habeas corpus, 28
> U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or
> sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486-87, 114 S. Ct. 2364 (footnote omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81

(2005) ("*Heck* specifies that a prisoner cannot use § 1983 to obtain damages where success

would necessarily imply the unlawfulness of a (not previously invalidated) conviction or

sentence.").

By necessary implication, the rulings on Munchinski's PCRA I petition are also

invalidated. Moreover, the Court finds that neither issue preclusion nor claim preclusion are

available to bar Munchinski's § 1983 claim.

Under Pennsylvania law, the following conditions must exist before issue preclusion may

be invoked: (1) the issue decided in the prior adjudication was identical with the one presented in

the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea

is asserted was a party or in privity with a party to the prior adjudication; and (4) the party

20

against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action. *Gregory v. Chehi*, 843 F.2d 111, 121 (3d Cir. 1988). In this instance, the Court finds that Munchinski did not have a "full and fair" opportunity to litigate the issues.

Despite Judge Franks' order that the Commonwealth produce all Pennsylvania State Police investigation files related to the murders of Alford and Gierke, as well as three additional files on Bowen, for an *in camera* review, Warman did not fully comply with Judge Frank's Order. Moreover, Judge Franks, who had presided over Munchinski's PCRA I petition, testified at the PCRA III hearing and stated that had he been aware of the Bates Report, the Goodwin/Powell Report, and the Mangiacarne/Carbone Report, which were withheld from his *in camera* review by the prosecution, he may well have granted relief on Munchinski's PCRA I petition.

Further, at the PCRA I hearing, Goodwin testified that he did not recall whether a tape was made of the statement made by Bowen to Goodwin, Gorman, Fayock, Solomon and Warman in Solomon's office given on September 9, 1982. At the PCRA III hearing however, Goodwin testified that he personally observed Warman recording Bowen's statement on a tape recorder. Unlike his testimony at the PCRA I hearing, Goodwin's testimony at the PCRA III hearing was consistent with Goodwin's police report written on or about September 9, 1982, which detailed Goodwin's encounter with Bowen on September 9, 1982. The report was made while the encounter with Bowen was fresh in Goodwin's mind and Goodwin had no reason to file a false report at the time. Goodwin's testimony is also consistent with the fact they had Bowen sign a waiver of rights before he was interviewed by Solomon and Warman.

The Court has already determined that, because the rulings on the PCRA petitions have been invalidated and Munchinski's convictions have been vacated, the instant § 1983 claims are not barred by the prior state court actions.

The *Rooker-Feldman* Doctrine bars federal jurisdiction under two circumstances: "if the claim was 'actually litigated' in state court or if the claim is 'inextricably intertwined' with the state court adjudication." *ITT Corp. v. Intelnet Int'l Corp.*, 366 F.3d 205, 210 (3d Cir. 2004). In determining whether an issue was "actually litigated" by the state court, "a plaintiff must present its federal claims to the state court, and the state court must decide those claims." *Id.* at 210 n.8 (citing *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 419 (3d Cir. 2003)). Determining that a claim was "actually litigated" requires that the state court has "considered and decided precisely the same claim that the plaintiff has presented to the federal court." *Id.* The claim in the instant matter involves the violation of Munchinski's civil rights pursuant to under 42 U.S.C. § 1983 and the monetary damages resulting therefrom. In the state court, Munchinski was seeking a new trial on his murder convictions. Obviously, the claims are not "precisely the same."

The Third Circuit has defined whether claims are "inextricably intertwined" with the state court adjudication stating:

> state and federal claims are inextricably intertwined (1) when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered [or] (2) when the federal court must . . . take action that would render [the state court's] judgment ineffectual. . . . If the relief requested in the federal action requires determining that the state court's decision is wrong or would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.

*ITT Corp. v. Intelnet Int'l Corp.*, 366 F.3d *ITT Corp. v. Intelnet Int'l Corp.*, 366 F.3d (internal quotation marks and citations omitted). Because the state court's rulings in this matter have been invalidated, the claims are not "inextricably intertwined." The *Rooker-Feldman* Doctrine, therefore, is inapplicable in this instance.

### 2.    Absolute Immunity

The Prosecutors argue that they are entitled to absolute immunity in this matter which would act as a bar to Munchinski's lawsuit.  As a general matter, prosecuting attorneys are absolutely immune from suits for damages under § 1983 based on activities that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Absolute immunity extends to both "activity taken while in court, such as the presentation of evidence or legal argument, as well as selected out-of-court behavior 'intimately associated with the judicial phases' of litigation." *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3rd Cir. 1992) (quoting  *Imbler v. Pachtman*, 424 U.S. at 430).  In contrast, actions taken by a prosecutor "in an investigative or administrative capacity" are protected only by qualified immunity.  *Id.*

A prosecutor bears the "heavy burden" of establishing entitlement to absolute immunity. *Light v. Haws*, 472 F.3d 74, 80-81 (3d Cir. 2007) (quoting *Forsyth v. Kleindienst*, 599 F.2d 1203, 1212 (3d Cir. 1979)). In light of the Supreme Court's "quite sparing" recognition of absolute immunity to § 1983 liability, the Court begins with the presumption that qualified rather than absolute immunity is appropriate. *Carter v. City of Philadelphia*, 181 F.3d 339, 355 (3d Cir. 1999) (citing *Burns v Reed*, 500 U.S. 478, 486-87 (1991)).  This Court, however, has already ruled that the Prosecutors are not protected by qualified immunity in this matter.

#### (a).    Absolute Immunity -Suppression of Evidence

With regard to Munchinski's allegation that the Prosecutors "knowingly failed to preserve" the tape of Bowen's initial interview on September 9, 1982, and Warman's admission that he intentionally edited the Goodwin Report before providing it to Munchinski, the Court finds that the Prosecutors are not entitled to absolute immunity. In *Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir. 2006), the Third Circuit held that where a prosecutor's role as advocate

23

has not yet begun, or where it has concluded, absolute immunity does not attach. *Id.* at 137

(quoting *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003)). On September 9, 1982,

Munchinski had not been charged, and the Prosecutors were interviewing Bowen to gather

information with regard to the murders in order to get probable cause to arrest Munchinski. The

Prosecutors have not shown that they were functioning as the state's advocate when performing

the above actions on September 9, 1982. Such actions were investigative, and therefore, not

entitled to the protection of absolute immunity.

Further, the Third Circuit has recognized that, "by virtue of their egregiousness, some

acts fall wholly outside the prosecutorial role no matter when or where they are committed." *Odd*

*v. Malone*, 538 F.3d 202, 211 (3d Cir. 2008) (citations omitted). Warman's intentional removal

of a paragraph from Goodwin's report regarding the September 9, 1982, interaction with Bowen

falls into this "egregious" category. Warman has no absolute immunity for his tampering with

the Goodwin Report.

Munchinski also alleges that the Prosecutors withheld exculpatory evidence after his

1983 mistrial through his retrial and conviction in 1986, and continued to withhold such

evidence before and during PCRA I. In each instance the Prosecutors were subject to orders of

the court. On October 31, 1983, after the mistrial, upon the filing of a "Petition to View

Evidence", the Honorable Richard D. Cicchetti "ordered and directed" that:

> counsel for the defendants, and the defendant, David Joseph Munchinski be
> permitted to examine, inspect, photograph and make record notes of all evidence
> that the Office of the District Attorney and/or the Pennsylvania State Police or
> their agents, may have in their possession or that they may acquire, that relates to
> the above captioned cases.

M App. Ex. 5. Despite such Order, the Prosecutors failed to provide Munchinski with several

evidentiary items that were found to be exculpatory by both the District Court and the Third

Circuit. During Munchinski's PCRA I hearing, Judge Franks ordered Warman to produce all

Pennsylvania State Police investigation files related to the murders of Alford and Gierke, as well as three additional files on Bowen, for an *in camera* review. Again, Warman failed to obey Judge Frank's Order, and Munchinski's PCRA I petition was denied.

The Orders required no advocacy by the Prosecutors. Judge Cecchetti's order required the Commonwealth to provide "all evidence" in the possession of the District Attorney or the Pennsylvania State Police. The Prosecutors had no discretion to decide what evidence was to be provided. Similarly, Judge Frank's order required that Warman[8] deliver entire files related to the murders or related to Bowen. In *Odd*, the Court of Appeals for the Third Circuit stated "[w]e can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience." *Odd v. Malone*, 538 F.3d at 214. Accordingly, this Court finds that the Prosecutors do not have absolute immunity for disobeying the courts' orders and failing to provide Munchinski with the exculpatory evidence withheld after his mistrial in 1983 and prior to and during the PCRA I hearing.

(b).    Absolute Immunity –Malicious Prosecution

To establish a malicious prosecution claim, Munchinski must produce evidence that he was prosecuted without probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). The Third Circuit, however, has already determined that the Prosecutors have absolute immunity with regard to their decision to charge Munchinski. Specifically, the Court stated:

---

[8]    Warman was the District Attorney of Fayette County at the time Munchinski filed the PCRA I petition, and John Kopas was the assistant district attorney handling the PCRA. Warman, nonetheless, was ultimately responsible for the failure to provide complete files. Notwithstanding such failure at PCRA I, all of the evidence at issue in the instant matter was required to be provided to Munchinski in 1982 and 1983. Whether Warman was personally involved in overseeing the collection of the files requested by Judge Franks, therefore, is of no moment.

Munchinski alleges that the Prosecutors ignored Bowen's inconsistent interview statements and thus could not have reasonably believed there was probable cause to arrest and charge him. The arrest of a criminal defendant and the filing of charges are at the core of the prosecutorial function, and "[a] prosecutor is absolutely immune when making [the decision to initiate a prosecution], even where he acts without a good faith belief that any wrongdoing has occurred." *Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir. 1992). Accordingly, the Prosecutors are entitled to absolute immunity for this conduct. *Id.*; *see also Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997) (holding that a prosecutor's filing of an arrest warrant and charging documents are protected by absolute immunity).

*Munchinski v. Solomon*, 618 Fed. Appx. 150, 154 (3d Cir. 2015).

Accordingly, the Prosecutors' motion for summary judgment on Munchinski's claims under 42 U.S.C. § 1983 alleging malicious prosecution will be granted.

### 3. *Brady* Violations and § 1983

Munchinski is asserting claims under 42 U.S.C. § 1983 alleging violation of his rights under the Sixth and Fourteenth Amendments[9] to the United States Constitution. Clearly, Munchinski can maintain an action under § 1983 by alleging prosecutors and/or police officers violated his procedural due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). *Williams v. Krystopa*, 1998 U.S. Dist. LEXIS 20021, 8 (E.D. Pa. Dec. 15, 1998) (Citations omitted). To recover damages under § 1983, however, Munchinski must show more than a *Brady* violation. *See Johnson v. Mahoney*, 424 F.3d 83, 89 (1st Cir. 2005); *see also Rodriguez v. Woodall*, 189 F. App'x 522, 527 (7th Cir. 2006) ("[A] constitutional violation, such as a *Brady* violation, is necessary, but more is needed."). He also must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction. *Johnson v. Mahoney*,

---

[9] In *Brady*, the Supreme Court tied the requirement that a prosecutor turn over favorable evidence to a criminal defendant to the Due Process Clause of Fourteenth Amendment to the United States Constitution, not the Sixth Amendment. *Brady v. Maryland*, 373 U.S. at 86.

424 F.3d at 89. As an initial matter, then, Munchinski must show that his due process rights under *Brady* were in fact violated.

In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87. *Brady* was an "extension" of a line of cases beginning with *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Pyle v. Kansas*, 317 U.S. 213 (1942), in which the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction. *Brady v. Maryland*, 373 U.S. at 86; *see also Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (noting that *Brady* "can trace its origins to early 20th-century strictures against misrepresentation"). A *Brady* violation occurs if: "(1) the evidence at issue is favorable to the accused, because [it is] either exculpatory or impeaching[10]; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).

The Prosecutors argue that this Court must apply the law interpreting *Brady* that was controlling at the time the Commonwealth produced discovery for Munchinski's 1983 and 1986 murder trials, which they contend requires the application of a due diligence standard. In the 1980s and 1990s, the Prosecutors argue, the Third Circuit applied a reasonable diligence standard, holding that the government is not required to furnish a defendant with information

---

[10]   The Supreme Court has explicitly held that impeachment evidence need not also be exculpatory in order to be favorable, and thus discoverable, under *Brady. Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999). At the time of Munchinski's 1986 trial it had been established that impeachment evidence fell within the rule in *Brady. See United States v. Bagley*, 473 U.S. 667 (1985).

which he already has or, with reasonable diligence, can obtain himself. *Citing United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (citing *United States v. Campagnuolo*, 592 F.2d 852, 861(5th Cir. 1979)); and *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) ("It is true that *Brady* does not oblige the government to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence."). The Prosecutors further contend that from 1982 to 1995, *Brady* did not require them to produce evidence that was in the exclusive possession of the police.

In *Perdomo*, however, the Court of Appeals found that the district court erred as a matter of law in ruling that the prosecution's failure to learn and disclose the witness's criminal record was not a suppression of exculpatory evidence, stating*, inter alia*:

> Notwithstanding this particular branch of the *Brady* doctrine, the facts of the instant case do not even remotely suggest that defense counsel had any knowledge or, more importantly, any responsibility to be aware of the witness' criminal record. It is untenable to suggest that, in order to obtain impeachment evidence on behalf of a client, a public defender is, in any way, obligated to check the total list of persons who have been served by the agency to ascertain whether a prospective witness was a former client. . . Moreover, the prosecution, not the defense, is equipped with the resources to accurately and comprehensively verify a witness' criminal background. Therefore, we find the district court's allocation of the burden to the Office of the Public Defender incorrect as a matter of law and as a matter of fairness.

*Id.* at 973.

The *Perdomo* court also adopted the Fifth Circuit's approach when considering whether the prosecution is responsible for a potential *Brady* violation. The Fifth Circuit refused "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." *United States*

*v. Perdomo*, 929 F. 2d at 970 (quoting *United States v. Antone*, 603 F.2d 566 (5th Cir. 1979)).

The court further stated:

> It is well accepted that a prosecutor's lack of knowledge does not render information unknown for *Brady* purposes. The Fifth Circuit has spoken the most often on this issue and has declined to excuse non-disclosure in instances where the prosecution has not sought out information readily available to it.

*United States v. Perdomo*, 929 F. 2d at 970 (citing *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)).[11]

Such standard is not unlike the *Brady* standard, set forth below, used by this Court in resolving Munchinski's 2007 writ of habeas corpus:

> As the Court of Appeals has recently reaffirmed, "[a] *Brady* violation occurs if: (1) the evidence at issue is favorable to the accused, because [it is] either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" The requirement that the prosecution disclose such information extends not only to information that is actually known to the prosecutors, but also to "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." Willful or morally culpable suppression of *Brady* evidence is not necessary for relief to be granted. The Supreme Court has long recognized that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." Even a criminal defendant's failure to request favorable evidence does not abrogate the prosecution's disclosure obligations. "[A] defendant's failure to request favorable evidence [does] not leave the Government free of all obligation[,]" and a *Brady* violation might arise even "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way"

*Munchinski v. Wilson*, 807 F. Supp. 2d at 274-275 (internal citations omitted).

The Court will analyze the evidence at issue to determine if the withholding of the evidence constituted a *Brady* violation[12].

---

[11]    It should be noted, however, that the entire Pennsylvania State Police file on the Munchinski investigation was made available to Solomon and Warman so they could access and provide anything necessary in discovery.  F CSMF ¶¶ 25-29.

<span style="text-decoration: underline;">The Goodwin Report</span>

The Goodwin Report detailed Goodwin's encounter with Bowen on September 9, 1982, and the circumstances surrounding an alleged statement regarding the murders made by Bowen to Goodwin, Gorman, Fayock, Solomon and Warman in Solomon's office. In his report, Goodwin stated as follows:

> Bowen stated that he would go with reporting officer and Cpl. Bernard Gorman the Fayette Co. Courthouse and furnish a statement to the District Attorney relative to this case. He stated he would testify if he was given immunity. Reporting officer advised Bowen of his rights at the D.A. Office [sic] at 1620 hrs. at which time he signed a waiver. Present during the interview [were] [Solomon, Warman, Mangiacarne, Fayock, Gorman, Goodwin and Bowen]. A statement was furnished and taped which will be transcribed by the D.A. office . . .

M. App. Ex. 13. Warman admitted that he intentionally edited the Goodwin Report, removing the above paragraph and pasted together the surrounding paragraphs in such a manner as to conceal its removal.

Goodwin's testimony regarding whether a tape was in fact made of Bowen's statement has changed over the years, but this Court gives more credence to Goodwin's report made contemporaneous with Bowen's original interview when Goodwin had no reason lie. Fayock, as Goodwin's supervisor initialed and approved the report. *See* M. App. Ex. 12 p. 187. Judge Franks and Judge Feudale each reached a different conclusion with respect to whether the recorded statement referred to in the omitted paragraph of the Goodwin Report did exist. In this instance, the Court finds that whether Bowen's initial statement was recorded is a material issue of fact for the jury to decide.

---

[12] The materiality of any evidence the Court finds was suppressed will be determined collectively and not on an item by item basis. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

Given how radically Bowen's statement given on October 21, 1982, as well as his trial testimony, differed from his September 1982 statement, the Court finds such evidence was favorable to Munchinski and, therefore, discoverable.

The Bates Report

The Bates report is a one-page report of trooper George F. Bates, dated January 6, 1978, relating an interview with Maria Caccia, who indicated that Bowen had left Pennsylvania for Oklahoma on December 1, 1977, before the murders of Alford and Gierke. The Prosecutors argue that Munchinski knew about Bates' investigation and Bowen's alleged presence in Oklahoma, therefore there was no *Brady* violation. In support, they argue that Munchinski filed a motion to compel the Commonwealth to supply discovery information about Bates and Bowen's presence in Oklahoma, but the motion was denied.

The Prosecutors admit, however, that Bates testified at the 1983 trial. Because Bates was part of the "prosecution team," the Prosecutors had access to Bates' investigative file and were obligated to turn over any exculpatory evidence therein. There is no evidence that because Munchinski's defense suspected Bowen was in Oklahoma that they knew of Bates' interview with Maria Caccia. The Bates Report is certainly exculpatory, was in the possession of the prosecution team and was not turned over to Munchinski prior to either trial in violation of *Brady*.

The Goodwin/Powell Report and Powell Addendum

The Goodwin/Powell report is a report, dated December 20, 1977, written by Goodwin in which he indicated that Deputy Coroner Jack Powell informed him that it was believed that the anal intercourse to which Alford was subjected would have taken place twenty-four (24) hours prior to his death. The addendum contains the same information. Such information conflicts with

Bowen's testimony that he witnessed Munchinski and Scaglione rape the victims. At the PCRA III hearings, however, Powell denied making such statements and further testified that, as a mortician, he was not qualified to offer such opinion. The Prosecutors also argue that there is no evidence that they knew about the Powell report prior to Munchinski's trials in 1983 and 1986.

As set forth above, the Third Circuit specifically stated that a prosecutor's lack of knowledge "does not render information unknown for *Brady* purposes." *United States v. Perdomo*, 929 F. 2d at 970. Moreover, this evidence is favorable to Munchinski because it contradicts the testimony of the only eyewitness to the murders. Though there is a question of reliability, such a determination ids for the jury. Moreover, it is necessary to consider the cumulative effect of this favorable evidence with the other *Brady* material.

### Alford Autopsy Addendum

On December 17, 1977, Dr. Sava signed a one-page addendum to Alford's autopsy indicating that the medical samples taken from Alford's rectum were of blood group "A". Munchinski's blood group is "B". Though Dr. Sava noted that cross-contamination from Alford's own semen could not "be entirely ruled out" based on the low number of spermatozoa found in Alfords rectum, the possibility that the collected sperm was from Alford certainly impeaches, or casts doubt, on Bowen's testimony that Munchinski raped Alford.

### The Mangiacarne/Carbone Report

In a report dated December 16, 1980, Mangiacarne detailed the interview he conducted with Elizabeth Carbone ("Carbone"). Carbone stated that an individual named Mike Urdzik ("Urdzik") told her that he witnessed Ed Wiltrout murder Alford and Gierke in December of 1977 over a drug deal. She alleged that Urdzik was her drug dealer and he told her this only two weeks after the murders were committed.

This evidence was clearly favorable to Munchinski. Aside from Bowen's testimony, the only evidence linking Munchinski to the murders was (1) testimony from Lexa, Dahlmann, and Furr, three acquaintances who testified that Munchinski confessed to them in a bar in January 1978; and (2) testimony from Thomas, a jailhouse informant who claimed that Munchinski confessed to him in jail. Mangiacarne's report is evidence that Dahlmann, Lexa, and Furr had a motivation to fabricate Munchinski's supposed confession, to keep Dahlmann's ex-husband Wiltrout from being implicated in the crime.

The Prosecutors argue that they provided Munchinski with a police report written by Goodwin that contained the same information as Mangiacarne's report. Mangiacarne's report, therefore, was "merely" cumulative as Munchinski was informed of the two (2) alternate suspects, and with "reasonable diligence could have investigated the matter. The Prosecutors' obligation to disclose *Brady* materials, however, applies even to evidence that appears redundant. "Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations." *Monroe v. Angelone*, 323 F.3d 286, 301 (4th Cir. 2003). Mangiacarne's report was exculpatory, and gave an alternate theory of the case that fit with other evidence discovered in the case. The report should have been turned over to Munchinski before trial.

The Kinch Report

In a report dated December 19, 1977, Trooper Robert Kinch ("Kinch"), indicated that certain physical evidence, including nail scrapings, had been taken from the murder scene. The PCRA III court ordered the evidence undergo DNA testing, but the results were inconclusive. Negative or inconclusive results may be exculpatory even where they do not provide definitive evidence on a particular issue. *Simmons v. Beard*, 590 F.3d 223, 237 (3d Cir. 2009). "Neutral forensic evidence may, because of its neutrality, tend to be favorable to the accused. While it does not by any means establish his absence from the scene of the crime, it does demonstrate that

a number of factors which could link the defendant to the crime do not." *Id.* (quoting *Patler v. Slayton*, 503 F.2d 472, 479 (4th Cir. 1974)).

Because there was no physical evidence linking Munchinski to the scene of the murders, the absence of evidence linking him to the crimes support his contention that he was not present when Alford and Gierke were killed. The existence of samples of physical evidence was favorable to Munchinski and suppression of such violates *Brady*.

### Bowen's Parole Revocation Documents

Documents related to Bowen's 1983 parole revocation hearing in Westmoreland County, Pennsylvania, hearings indicate that an undisclosed agreement for leniency existed between Bowen, the Westmoreland County District Attorney's office, and the Fayette County District Attorney's office. Such documents are clearly impeachment material that required disbursement to Munchinski.

In his closing argument to the jury, Warman stated: "did you hear anyone testify that Bowen received anything other than immunity? No . . . does that bolster his testimony to indicate that Bowen was there?" *Munchinski v. Wilson*, 694 F.3d at 316. The Third Circuit found that Warman's argument "misled the jury" because prosecutors in Fayette County had reached a leniency agreement with Bowen, whereby in Westmoreland County prosecutors would be lenient towards Bowen in his ongoing parole revocation hearings in exchange for Bowen's testimony against Munchinski. *Id.* The Prosecutors were obligated, therefore, to turn over the documents related to Bowen's revocation violation to Munchinski.

### The Dunkard/Proud Report

On December 5, 1977, Trooper Edward Dunkard ("Dunkard") wrote that Delores Proud ("Proud"), then a dispatcher for the Mt. Pleasant, Pennsylvania, Police Department, stated that she received a call at 2:32 A.M. on December 2, 1977, from a telephone operator who told her

that "[a] man said he was shot and lives at 837 Alpine Rd., in Bear Rocks." Proud also indicated that she received a call at 2:50 A.M. from Bonnie Blackson, to report that she had found Alford's body on her porch. The report calls into question the physical possibility of Bowen's recitation of the events on the night of the murders. Accordingly, this report should have been turned over pursuant to *Brady* as it would have aided any attempts to impeach Bowen's testimony.

### The Veil/Mangello Report and The Madden/Lucy Report

Trooper Richard Veil ("Veil") authored a one page report on June 23, 1986, in which inmate Robert Lee Mangello ("Mangello") indicated that Joseph Lucy ("Lucy"), Scaglione, and a third, unnamed man, committed the murders of Alford and Gierke in "1972-1973". Mangello alleged that Lucy informed him that Lucy's car, a green Chevrolet or Pontiac, had been used in the murders

On October 15, 1986, Trooper William F. Madden ("Madden") reported that Lucy denied Mangello's accusations, including denying that he ever owned a green Chevrolet or Pontiac. Lucy further stated that Mangello was a witness to the murders.

Though there is an unidentified suspect and though Mangello had the date of the murders incorrect, the Court finds that the reports certainly could have aided Munchinski in his defense during the second trial. The above statements call into question Bowen's recollection of the car used on the night of the murders, and include the addition of Mangello or Lucy as suspects in the murders. Accordingly, the reports were required to be turned over under *Brady*.

### The Bates II Report

The Bates II Report is a marked copy of the above-mentioned "Bates Report," which Munchinski contends emphasizes the passage "and BOWEN left on the 1st of December," and further argues that this bolsters his contention that prosecutors knew that Bowen was in transit to Oklahoma at the time of the murders. Just as the Court found above, Bates II is exculpatory and

was in the possession of the prosecution team, but there is a question of material fact regarding when the copy was marked. Fayock contends that Trooper Daniel J. Venick ("Venick"), in reviewing the PSP file in 2003, found a copy of the Bates Report and placed parenthesis around the phrase at issue. Accordingly, the Court is unable to find that a *Brady* violation occurred regarding Bates II.

Materiality of the <u><em>Brady</em> Evidence</u>

The "materiality" of suppressed evidence must be determined collectively, and not item-by-item. *Kyles v. Whitley*, 514 U.S. at 436. Further, the "materiality" test under *Brady* does not require a petitioner to show that "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-435. Instead, evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435 (footnote omitted).

Having comprehensively reviewed the evidence at issue, and having read the opinions of the United States District Court for the Western District of Pennsylvania[13] and the United States Court of Appeals for the Third Circuit[14] on this same issue, this Court finds that the cumulative effect of the suppressed evidence was prejudicial to Munchinski's defense. The Prosecutors were in violation of *Brady v. Maryland* for the suppression of material evidence favorable to Munchinski. To recover damages under § 1983, however, Munchinski must also demonstrate by a preponderance of the evidence a causal link between the *Brady* violations and his conviction. Such a determination in this instance is for the jury.

---

[13]    *Munchinski v. Wilson*, 807 F. Supp. 2d 242 (W.D. Pa. 2011).

[14]    *Munchinski v. Wilson*, 694 F.3d 308, 316 (3d Cir. Pa. Sept. 11, 2012).

Accordingly, the Prosecutors' motion for summary judgment on Munchinski's claims under 42 U.S.C. § 1983 alleging violation of his rights under the Fourteenth Amendment to the United States Constitution will be denied.

B.    Fayock

1.    Full, Faith and Credit to State Court Decisions; Issue/
      Claim Preclusion; and the *Rooker-Feldman* Doctrine

For the reasons set forth in Section A (1) above, the instant § 1983 claims are not barred by the prior state court actions, and the *Rooker-Feldman* Doctrine is inapplicable.

2.    Qualified Immunity

Fayock contends he is entitled to qualified immunity to bar Munchinski's § 1983 claim for violation of the Fourteenth Amendment. State officials are entitled to qualified immunity as long as their actions were objectively reasonable given the existing law and the information that they possessed at the time. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  Here, Fayock argues that the duty to disclose under *Brady* applied only to the prosecutor at the times relevant to the instant action.

In *Gibson v. Superintendent of N.J. Dep't. of Law & Pub. Safety-Division of State Police*, 411 F.3d 427, 442 (3d Cir. 2005) the Third Circuit found that, before 1995, police officers were entitled to immunity if they failed to produce exculpatory evidence, because their obligation to turn over this evidence was not clearly established constitutional law until 1995. Specifically, the Court stated:

> Although this Court held in *United States v. Perdomo*, 929 F.2d [at 970], that evidence in the hands of the police could be imputed to the prosecutor, the Supreme Court did not settle this matter until 1995 when it decided *Kyles v. Whitley*, 514 U.S. at 437, ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). More importantly, the related duty of the police to disclose information to the prosecutor was not widely addressed until later. Even in 2000, this Court was only able to assume that police officers "have an

37

affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Smith v. Holtz*, 210 F.3d 186, 197 n.14 (3d Cir. 2000). Because such a right was not clearly established in this Circuit at the time of Gibson's conviction, Troopers Pennypacker and Reilly are entitled to qualified immunity with regard to their failure to inform the prosecutor of *Brady* material.

*Gibson v. Superintendent*, 411 F.3d at 443-444. The court further noted that a "prosecutor has a responsibility not just to disclose what he or she knows but to learn of favorable evidence known to others acting on the government's behalf." *Id.* at 443.

The Supreme Court previously noted the special role the prosecutor plays within the adversarial process stating:

Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 [ ] (1935).

*Strickler v. Greene*, 527 U.S. 263, 281 (1999). This "special status" underpins the *Brady* rule and explains why the duty of disclosure rests squarely on the shoulders of the prosecutor. *Id.*

Prior to 1995, then, the duty of the police to disclose information to the prosecutor was not clearly established. In the instant action, Fayock is entitled to qualified immunity for claims related to the violation of *Brady v. Maryland* for Munchinski's 1983 and 1986 trials, as well as for Munchinski's PCRA I petition before Judge Franks. Because there is no evidence that Fayock suppressed evidence prior to Munchinski's PCRA III petition before Judge Feudale, summary judgment will be entered in favor of Fayock on Munchinski's claims under 42 U.S.C. § 1983 alleging violation of his rights under the Fourteenth Amendment to the United States Constitution.

3        Malicious Prosecution

To prove malicious prosecution under § 1983, a plaintiff must show that: (1) the

defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor;

(3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or

for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation

of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Kossler*

*v. Crisanti*, 564 F.3d 181, 186 (3d Cir. Pa. Apr. 21, 2009) (quoting *Estate of Smith v. Marasco*,

318 F.3d 497, 521 (3d Cir. 2003)).

Fayock contends he has no liability for malicious prosecution in this instance because: (1)

he did not have the requisite personal involvement in the prosecution to support individual

liability; and (2) there was probable cause for Munchinski's arrest for the murders of Alford and

Gierke.  Fayock argues that he was not the lead investigator, he was merely one of Goodwin's

supervisors, Goodwin prepared the Affidavit of Probable Cause, and Goodwin signed and filed

the criminal complaint against Munchinski and Scaglione. Fayock admitted, however, that "in

these types of cases, I usually took a very direct role." M. App. Ex. 12  p. 188.   Moreover,

Fayock admitted that he met with Bowen on several occasions, and was very involved in the

determination of whether or not to prosecute Munchinski. M. App. Ex. 12, pp. 55 & 68.

Considering the facts in the light most favorable to Munchinski, and drawing all

reasonable inferences therefrom, the Court is unable to find as a matter of law that Fayock had

no involvement in the decision to prosecute Munchinski. He admits he worked very closely with

the prosecutors in deciding to charge Munchinski, and he also had several opportunities to

interview Bowen to gauge his reliability or lack thereof.

In § 1983 cases, the question of probable cause is generally one for the jury.  *See Merkle*

*v. Upper Dublin School Dist.*, 211 F.3d 782, 789 (3d Cir. 2000).  It is particularly a jury issue

where probable cause rests on a credibility determination. *Id.* A district court, however, may conclude "that probable cause exists as a matter of law if the evidence, viewed most favorably to plaintiff, reasonably would not support a contrary factual finding." *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). Probable cause to arrest "exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey*, 71 F.3d at 483; *see also Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue.").

Fayock maintains that Bowen's positive identification of Munchinski as one of killers was sufficient by itself to establish probable cause. The Third Circuit, however, found such identification problematic when an officer relies on witness statements that he or she knows are unreliable. *See Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000); *Harris v. Jacobs*, 2012 U.S. Dist. LEXIS 134044 at *21 (E.D. Pa. Sept. 18, 2012) (An officer may have a duty to further investigate when . . . circumstances indicating a witness's unreliability are known.). Specifically, the court stated:

> While we agree that a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause, this qualified precept cannot be rendered absolute. Independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist. Each case must therefore be examined on its facts.

*Wilson v. Russo*, 212 F.3d at790. Moreover, "an officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)).

This record is replete with exculpatory evidence that was either in the possession of the prosecutors or was in the investigative file of the State Police prior to the decision to charge Munchinski with double murder. Whether the exculpatory evidence and evidence of the Bowens' unreliability outweighs the identification and evidence of Munchinski's alleged comments at the Five Points Bar in Greensburg with regard to the existence of probable cause is an issue for the jury.

Finally, Fayock contends that Munchinski's criminal proceeding did not end in his favor because his conviction was upheld by the Superior Court in 1990, 1995 and 2005. The Court disagrees. In 2011, the District Court granted Munchinski habeas relief, vacated his convictions, and gave the Commonwealth 120 days to retry him. Upon appeal by the Commonwealth, the Third Circuit called Munchinski's conviction "badly tainted and highly suspect," affirmed the judgment of the District Court, and ordered the Commonwealth to either release Munchinski or retry him within 120 days of the date of the Court's opinion. *Munchinski v. Wilson*, 694 F.3d at 339. The Commonwealth failed to retry Munchinski within the requisite 120 days, and on June 13, 2013, Judge Nancy Vernon of the Court of Common Pleas of Fayette County granted Munchinski's motion to dismiss all charges filed with prejudice. Am. Compl. ¶ 15.

Accordingly, Fayock's motion for summary judgment on Munchinski's claim under 42 U.S.C. § 1983 alleging malicious prosecution will be denied.

    B.    <u>Munchinski's Motion for Summary Judgment</u>

        1.    <u>Collateral Estoppel/*Res Judicata*</u>

Munchinski argues that this Court must apply preclusive effect to the judgments of the District Court and the Court of Appeals of the Third Circuit and enter summary judgment against Defendants on his claims. The Court disagrees.

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as *res judicata*. Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.* at 748-749. By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-154 (1979).

The Supreme Court further held:

> A person who was not a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." Indicating the strength of that tradition, we have often repeated the general rule that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."

*Taylor v. Sturgell*, 553 U.S. 880, 892-893 (U.S. 2008) (citations omitted).[15]

Because the Defendants herein were not named parties to the prior litigation, and because they did not have a full and fair opportunity to litigate the issues and claims that must be resolved herein, this Court finds the doctrines of collateral estoppel and *res judicata* inapplicable.

---

[15]   The rule against nonparty preclusion is subject to six (6) recognized exceptions, none of which apply in this instance. *Taylor v. Sturgell*, 553 U.S. at 893.

2.    *Brady* Violations and § 1983

As set forth in Section A (3) above, the Court found that the Prosecutors were in violation of *Brady v. Maryland* for the suppression of material evidence favorable to Munchinski, and summary judgment will be granted in favor of Munchinski to that extent. To recover damages under § 1983, however, Munchinski must demonstrate by a preponderance of the evidence a causal link between the *Brady* violations and his conviction.

3    Malicious Prosecution

As set forth in Section B (3) above, the Court found that material issues of fact are in dispute regarding Munchinski's claim under 42 U.S.C. § 1983 alleging malicious prosecution. Accordingly, his motion for summary judgment regarding the malicious prosecution claim will be denied.

## V.    CONCLUSION

Based on the foregoing, the motions for summary judgment filed on behalf of the parties in this action will be granted in part and denied in part. An appropriate order will follow.

Cercone, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**DAVID MUNCHINSKI**,       )
                           )
      Plaintiff,       )
                           )
      v.                )     2:13cv1280
                           )     **Electronic Filing**
**GERALD SOLOMON**, and   )
**RALPH WARMAN**,       )
in their individual capacities; and **DANA** )
**L. FAYOCK**, Executrix of the Estate of )
George Fayock,           )
                           )
      Defendants.    )

### ORDER OF COURT

AND NOW, this 27th day of June, 2017, upon consideration of the Motions for Summary Judgment filed on behalf of the above-captioned parties, the responses thereto, the briefs and appendices filed in support thereof, pursuant to this Court's Memorandum Opinion filed herewith,

IT IS HEREBY ORDERED as follows:

1.     The Motion for Summary Judgment filed on behalf of Dana L. Fayock (**Docket No. 125**) is granted in part and denied in part. With regard to Plaintiff's claim under 42 U.S.C. § 1983 alleging violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, the motion is **GRANTED**. In all other aspects, the motion is **DENIED**;

2.     The Motion for Summary Judgment filed on behalf of Gerald Solomon (**Docket No. 129**) is granted in part and denied in part. Solomon's motion for summary

judgment on Plaintiff's claims under 42 U.S.C. § 1983 alleging malicious prosecution is **GRANTED**.  In all other aspects, the motion is **DENIED**;

> 3.  The Motion for Summary Judgment filed on behalf of Ralph Warman (**Docket No. 132**) is granted in part and denied in part.  Warman's motion for summary judgment on Plaintiff's claims under 42 U.S.C. § 1983 alleging malicious prosecution is **GRANTED**.  In all other aspects, the motion is **DENIED**; and

> 4.  The Motion for Summary Judgment filed on behalf of David Munchinski (**Docket No. 136**) is granted in part and denied in part.  The motion is **GRANTED** to the extent the Court finds Plaintiff's rights under *Brady v. Maryland* were violated by Warman for the intentional revision of the Goodwin Report, and by both Warman and Solomon for their suppression of the following exculpatory evidence: (1) the Bates Report; (2) the Goodwin/Powell Report; (3) the Powell Addendum; (4) Alford's Autopsy Addendum; (5) the Mangiacarne/Carbone Report; (6) the Kinch Report; (7) Bowen's Parole Revocation Documents; (8) the Dunkard/Proud Report; (9) the Veil/Mangello Report; and (10) the Madden/Lucy Report. In all other aspects, the motion is **DENIED**.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:   Noah Geary, Esquire
      Bethann R. Lloyd, Esquire
      Jason R. McLean, Esquire
      Thomas P. Pellis, Esquire
      Lee R. Demosky, Esquire
      Mary L. Friedline, Esquire

      (*Via CM/ECF Electronic Mail*)